UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

LAROSE TAYLOR FOR                          CIVIL ACTION
HER DAUGHTER, T.S.T.

VERSUS                                     NUMBER: 10-00214

MICHAEL J. ASTRUE,                         SECTION: "N"(5)
COMMISSIONER OF SOCIAL SECURITY
ADMINISTRATION


### REPORT AND RECOMMENDATION


Pursuant to 28 U.S.C. §636(b) and Local Rule 73.2(B), this matter comes before the Court on the parties' cross-motions for summary judgment following a decision of the Commissioner of the Social Security Administration denying plaintiff's application for Supplemental Security Income ("SSI") benefits.  (Rec. docs. 11, 12).

On October 16, 2006, Larose Taylor, mother of the plaintiff-in-interest herein, T.S.T., filed an application for SSI benefits on behalf of the minor child alleging disability as of June 2, 2002 due to a "behavior disability" and being a "slow learner." (Tr. pp.

40-46, 61, 93).[1]/ Plaintiff's application for SSI benefits was denied at the initial level of the Commissioner's administrative review process on September 5, 2007. (Tr. pp. 36-39). Pursuant to plaintiff's request, a hearing de novo before an Administrative Law Judge ("ALJ") went forward on August 26, 2008 at which plaintiff's mother appeared and testified. (Tr. pp. 32, 148-172). On October 21, 2008, the ALJ issue a written decision in which he concluded that plaintiff was not disabled within the meaning of the Social Security Act. (Tr. pp. 15-27). The Appeals Council ("AC") subsequently denied plaintiff's request for review of the ALJ's decision, thus making the ALJ's decision the final decision of the Commissioner. (Tr. pp. 11-13). It is from that unfavorable decision that the plaintiff seeks judicial review pursuant to 42

---

[1]/ In his written decision denying SSI benefits, the ALJ stated that the application for benefits was protectively filed on October 16, 2006 but provided no citation to the record where that date could be confirmed. (Tr. p. 18). What the record does contain are 2 applications for SSI benefits, the first of which was filed on January 18, 2007 and the second of which was filed on July 26, 2007. (Tr. pp. 40-42, 43-46). The record also contains a Disability Report that was completed on July 27, 2007, presumably in connection with the second application for SSI benefits, which provided a protective filing date of June 20, 2007 and indicated that plaintiff had previously filed an application for SSI benefits, presumably the one dated January 18, 2007, that had been denied at the initial level of the Commissioner's administrative review process on March 16, 2007. (Tr. pp. 57-59). Nonetheless, because the Administrative Law Judge and the parties herein have utilized October 16, 2006 as the operative filing date, the Court will do likewise.

U.S.C. §§405(g) and 1383(c)(3).

In her cross-motion for summary judgment, plaintiff presents no specific legal challenge(s) to the Commissioner's decision. (Rec. doc. 11). Rather, she simply provides a brief recitation of the evidence admitted in the administrative proceedings which is preceded by the suggestion that the Commissioner's decision be reversed because the child suffers from attention deficit disorder ("ADD"), unspecified, a learning disorder, and depression and followed with a request that the case be remanded to allow the ALJ to re-examine the totality of the circumstances. (Rec. doc. 11-1). Relevant to the resolution of the motions that are presently before the Court are the following findings made by the ALJ:

1.   [t]he claimant was born on March 4, 1999. Therefore, she was a school-age child on October 16, 2006, the date the application was filed, and is currently a school-age child (20 CFR 416.926a(g)(2)).

2.   [t]he claimant is a minor and has never engaged in substantial gainful activity (20 CFR 416.924(b) and 416.972).

3.   [t]he claimant has the following combination of impairments: affective disorder and learning disorder that are severe within [the meaning of] Regulation 20 CFR 416.924(c) and Stone v. Heckler, 752 F.2d 1099 (5th Cir. 1985).

4.   [t]he claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.924, 416.925 and 416.926).

5.   [t]he claimant does not have an impairment or combination of impairments that functionally equals the listings (20 CFR 416.924(d) and 416.926(a)).

6.   [t]he claimant has not been disabled, as defined in the Social Security Act, since October 16, 2006, the date the application was filed (20 CFR 416.924 (a)).

(Tr. pp. 21, 22, 27).

Judicial review of the Commissioner's decision to deny SSI benefits is limited under 42 U.S.C. §405(g) to two inquiries: (1) whether substantial evidence of record supports the Commissioner's decision, and (2) whether the decision comports with relevant legal standards.  Anthony v. Sullivan, 954 F.2d 289, 292 (5th Cir. 1992); Villa v. Sullivan, 895 F.2d 1019, 1021 (5th Cir. 1990); Fraga v. Bowen, 810 F.2d 1296, 1302 (5th Cir. 1987).  If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed.  42 U.S.C. §405(g); Richardson v. Perales, 402 U.S. 389, 91 S.Ct. 1420 (1971).  A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings exist to support the Commissioner's decision. Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988).  Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Jones v. Heckler, 702 F.2d 616, 620 (5th Cir. 1983).  The Court may not reweigh the evidence or try the issues de novo, nor may it substitute its judgment for that of the Commissioner.  Cook v. Heckler, 750 F.2d 391, 392 (5th Cir. 1985).  Conflicts in the evidence are for the Commissioner to

4

resolve, not the courts.  <u>Patton v. Schweiker</u>, 697 F.2d 590, 592 (5th Cir. 1983).

A claimant, whether a child or an adult, bears the burden of proving that she is disabled within the meaning of the Social Security Act.  <u>Fraga</u>, 810 F.2d at 1301.  In making a disability determination on a child, the Commissioner utilizes the 3-step sequential analysis set forth in 20 C.F.R. §416.924, as follows:

1.  determine whether the child engaged in substantial gainful activity during the relevant time frame and, if not;

2.  determine whether the child has a medically determinable severe impairment and, if so;

3.  determine whether the impairment meets, medically equals, or is functionally equal to an impairment set forth in the Listing of Impairments, Appendix l, Subpart P, Part 404.

<u>See</u> <u>Verrett v. Commissioner of Social Security</u>, 2001 WL 179922 at *1 n.7 (E.D. La. Feb. 20, 2001).

In determining whether a child's impairment is functionally equivalent to one of those set forth in the Listing of Impairments, the Commissioner considers the child's limitations in the following 6 domains: acquiring and using information; attending and completing tasks; interacting and relating with others; moving about and manipulating objects; caring for oneself; and, health and physical well-being.  20 C.F.R. §416.926a(g)-(1).  To be

functionally equal to a listing and thus of listing-level severity, the child must have "marked" limitations in 2 of the 6 domains or an "extreme" limitation in 1 domain.  20 C.F.R. §416.926a(a).

As noted above, a hearing de novo before an ALJ went forward on August 26, 2008.  Ms. Taylor appeared at the hearing alone, reporting that Administration personnel had previously told her that her daughter's presence was unnecessary.  After being duly advised of her right to secure representation, Ms. Taylor elected to proceed alone and signed a written waiver to that effect.  After describing the manner in which the hearing would proceed, the ALJ admitted the documentary exhibits into evidence including records Ms. Taylor had brought which indicated that T.S.T. had a doctor's appointment scheduled for the following day and had recently had the dosage of her prescribed medication increased. Ms. Taylor was then given an opportunity to make an opening statement but declined. (Tr. pp. 150-158).

After being placed under oath, Ms. Taylor was questioned by the ALJ.  T.S.T. was 9 years of age at the time.  Ms. Taylor was a single mother who had 3 other daughters, ages 11, 8, and 1.  The oldest child was receiving SSI benefits for being a slow learner and being in special education classes for disability problems.  Ms. Taylor also received Social Security benefits herself in addition to welfare and food stamps and the children each received

6

$31 per month by virtue of their mother's receipt of benefits. Medical care was funded through Medicaid and Medicare. T.S.T. had just recently started third grade regular education classes, having successfully completed pre-K, kindergarten, and the first grade but having been held back for a year at the second grade level. While testifying that T.S.T. did both her in-school classwork and homework, Ms. Taylor stated that the child appeared to know very little and given that Ms. Taylor herself had only been to the ninth grade, she often enlisted the aid of a cousin to assist T.S.T. with her homework. Ms. Taylor testified that T.S.T. had a good relationship with her and her other 3 daughters but had experienced disciplinary problems at school the previous year although she had never been suspended or expelled. According to Ms. Taylor, T.S.T. got along with her teacher but was generally quiet and stayed to herself. When the unspecified disciplinary problems occurred, Ms. Taylor had been summoned to the school to meet with educational officials. T.S.T. had not been in any trouble with the law. (Tr. pp. 158-164).

When asked why she considered T.S.T. to be disabled, Ms. Taylor questioned how the child had been allowed to pass to the third grade as evidenced by difficulties in understanding and completing her homework. Ms. Taylor considered T.S.T. to be a slow learner and although she had been requesting a special education

7

evaluation from school officials since 2007, it had yet to occur. Plaintiff had been moved to a different school but continued to experience great difficulty in reading and completing her homework. Essentially, Ms. Taylor was contending that T.S.T. was disabled due to depression and a learning disorder.  T.S.T. saw Dr. Dahmes once per month and was then on Sertraline, the generic name for Zoloft. Physician's Desk Reference, 65th Ed. 2011, p. 124.  T.S.T. had never been hospitalized, was not in pain, had no physical abnormalities. (Tr. pp. 164-167).

When asked about personal hygiene, Ms. Taylor testified that T.S.T. had to be reminded to do things like take a bath or put on deodorant.  In terms of out-of-school activities, Ms. Taylor testified that the child typically stayed inside while the other children played outside but she did accompany her mother when visiting others.  T.S.T. also experienced crying spells on an unspecified basis which was one of the reasons the child had been placed on prescribed medication which was a great help in calming her down and putting her in a state where she listened and did the things that she was supposed to do.  When T.S.T. did not take her prescribed medication, Ms. Taylor testified that it was like she was a different person.  T.S.T. had no relationship with her father.  At the conclusion of Ms. Taylor's testimony, the ALJ elected to leave the record open for an additional 30 days to

8

obtain updated medical records from T.S.T.'s treating physician. (Tr. pp. 167-172).

The documentary evidence admitted in the administrative proceedings below begins with the report of a consultative psychological evaluation that was performed by Dr. James Gay on March 7, 2007 at the request of the State Disability Determination Services. T.S.T. was reported to have a history of behavior and learning problems but no medical information was included with the request for the evaluation. Dr. Gay indicated that plaintiff had not had any significant behavior problems recently but continued to underperform academically at school. Plaintiff was brought to the evaluation on time by her mother and she initially presented with a mildly depressed mood and slightly flat affect. However, as the session progressed she became more responsive and interactive and was able to answer questions adequately with her mother being a good informant regarding her history and status. Upon being separated from her mother and directed to the testing materials, plaintiff was slow in her approach but appeared willing to put forth effort. T.S.T. was able to understand directions without them having to be explained or repeated. The results of the testing were thus thought to be an accurate reflection of her then current level of functioning.

Although her hearing, vision, and coordination were reportedly

adequate, speech was considered slow and was understandable approximately 80% of the time. Two words were cited as having been mispronounced. Ms. Taylor reported that the child's health had been normal with no hospitalizations and she was not taking any medication at the time. T.S.T. was compliant and generally well-behaved at school with no history of detentions or suspensions. However, at home she tended to be withdrawn and appeared mildly depressed according to her mother. It was questionable whether plaintiff would pass on to the next grade level and she was being considered for evaluation for special education. T.S.T. was in second grade regular education classes in which she was making mostly D's and F's. Developmental milestones had been met on time but T.S.T. did have a history of speech therapy. She was able to dress herself, including tying her shoes and buttoning a button, and she was able to wash, bathe, and groom herself. T.S.T. assisted with chores on occasion but usually had to be reminded to do so. She had adequate sleeping patterns and a fair appetite and was of average height and weight. T.S.T. enjoyed activities such as playing games and jumping rope but she did not make friends easily and preferred to spend time alone.

As part of his evaluation of the child, Dr. Gay administered the WISC-IV for Children as well as a mental status examination. T.S.T. placed in the low average range in verbal comprehension,

placed in the borderline range in perceptual reasoning, working memory, and processing speed, and achieved a full-scale IQ score of 72, also in the borderline range.  Results from the mental status exam revealed that T.S.T. performed below average cognitively, experiencing difficulty in effectively responding to more complex tasks for her age.  She was also below average in short and long term memory, attending and concentration, and reasoning, especially with tasks of social adjustment and arithmetic.  The child occasionally experienced difficulty with frustration and tended to give up easily on more demanding tasks.

T.S.T.'s mood was reported to be mildly depressed but she denied suicidal or homicidal ideations.  She was oriented to time, person, and place and her fund of general knowledge was adequate. Hallucinations were denied and there were no signs suggestive of an underlying thought disorder. The prominent concerns were mood and academic performance with social judgment skills and the level of social maturity being below average.  The diagnostic impression was a learning disorder, not otherwise specified, and rule out dysthymic disorder in the Axis I category; deferred impressions in the Axis II and III categories; learning problems causing failing grades and limited social opportunities in the Axis IV category; and, a GAF score of 65.  T.S.T. was thought to be functioning in the borderline range of cognitive skills.  She was to be considered

for special education services and her mood was to be monitored by her mother for treatment as needed. (Tr. pp. 102-108).

The record also contains the Administration's Child Function Report that was completed on July 26, 2007 with the information contained therein being provided by Ms. Taylor.  There, it was reported that T.S.T. had no problems with seeing or hearing and was not totally unable to talk.  Uncertainty was expressed as to whether T.S.T.'s ability to communicate was limited as it was reported that she did not deliver telephone messages, repeat stories that she had heard, or tell jokes or riddles accurately. The child's ability to progress in leaning was also thought to be limited as she could not read and understand simple sentences or stories in books and magazines; could not write in longhand, could not spell most 3-4 letter words; could not add and subtract numbers over 10; did not know the days of the week and the months of the year; could not make change; and, could only tell time on a digital clock.  The child was not limited physically.

In terms of interaction with others, T.S.T. had friends her own age, could make new friends, and generally got along with adults and school teachers but played no team sports.  Despite what had been reported to Dr. Gay several months earlier, it was indicated in the Function Report that T.S.T. could not tie her shoelaces, bathe or shower by herself, comb, brush, or wash her

12

hair by herself, do what she was told, or accept criticism or correction with an added remark from Ms. Taylor that the child had to be repeatedly told what to do.  However, T.S.T. could use zippers and buttons, brush her teeth, choose clothes by herself, eat by herself using utensils, pick up and put away her toys, hang up her clothes, help around the house, obey safety rules, and get to school on time.  T.S.T.'s ability to pay attention and to stick with a task were limited but only to the extent that she could not keep busy on her own.  She could finish things that she had started, work on arts and crafts projects, complete her homework, and complete her chores most of the time. (Tr. pp. 47-56).

The administrative record also contains an undated letter from Dr. Charles Steck, a psychiatrist, in which he indicates that T.S.T. had begun receiving treatment in May of 2007 and had been diagnosed with ADHD and dysthymic disorder.  No medications had been prescribed at the time and the treatment consisted of counseling and psychosocial skills training with the next appointment being scheduled in August of 2007 to help manage T.S.T.'s emotional/behavior problems. (Tr. p. 133).

On August 1, 2007, T.S.T. and Ms. Taylor were seen by Dr. Steck with the mother reporting that the child could not follow instructions and cried a lot.  Unfortunately, the majority of the doctor's treatment note is not a model of legibility. (Tr. p. 111).

Dr. Steck also completed a 2-page "Mental Status Examination" form on that same day and what is discernable from that form is that T.S.T. was described as "a charming 8 yr. old" who was alert and made good eye contact.  Her attitude was helpful and hopeful with a good attention span and her speech and non-verbal behavior were "OK".  T.S.T. exhibited no sadness, thought processes were hopeful and helpful, and thought content was ordinary.  There were no perceptions, hallucinations, or illusions, the child was oriented as to person, place, and date, and memory was "OK".  Intellectual functioning was said to be average and insight/judgment and rapport were good.  The diagnosis appears to have been dysthymic disorder and an adjustment disorder with depressed mood. (Tr. pp. 112-113).

On August 16, 2007, Kenya Glynn, T.S.T.'s aunt, completed a second Child's Function Report.  In the form, Ms. Glynn reported that T.S.T.'s ability to communicate was limited, that she was unable to tell jokes or riddles accurately, was unable to explain why she did something, and did not talk with family or friends.  In explanation, Ms. Glynn indicated that the child did not like to follow directions, corrections, or instructions and did not know how to do her different homework assignments even after being helped. T.S.T.'s ability to progress in learning was felt to be limited as she could reportedly only print some letters and her name with the added remarks that the child did not focus well and

had been recommended for special education following a school evaluation.  The only physical abilities that were limited were the ability to swim and to dress/undress dolls or action figures. Contrary to what Ms. Taylor had reported just several weeks earlier, Ms. Glynn indicated that T.S.T. had no friends her own age, could not make new friends, and did not generally get along with other adults or teachers, getting along with others only when she was told to be nice.  Unlike Ms. Taylor, Ms. Glynn further reported that the child could tie her shoelaces, could take a shower or bath without help, and could accept criticism or correction but could not choose clothes by herself, eat using a fork or spoon, pick up and put away toys, or help around the house. The tasks that T.S.T. could perform were only accomplished when she was made to do so.  In terms of the child's ability to pay attention and to stick with a task, Ms. Glynn provided answers that were the opposite of what Ms. Taylor had given, indicating that T.S.T. did not finish things she had started, did not work on arts and crafts projects, did not complete her homework, and did not complete chores most of the time. (Tr. pp. 67-76).

On September 4, 2007, an Administration examiner formally requested that T.S.T's file be reviewed by a specialist in the field of mental health. (Tr. pp. 114). The following day, Dr. Robert McFarlain, a psychologist, reviewed plaintiff's file which

was noted not to have included records from Sylvanie Williams School, Buchanan Elementary School, or the East Baton Rouge Pupil Appraisal. The operative impairments were identified as dysthymic and learning disorders. After reviewing the file, Dr. McFarlain opined that T.S.T.'s impairments were severe but that they did not meet, medically equal, or functionally equal any of those set forth in the Listing of Impairments. In performing his functional equivalence analysis, the doctor found that T.S.T. had a less than marked limitation in the domain of acquiring and using information based on the full scale IQ score of 72 that had been obtained in March of 2007. A similar finding was made in the domain of attending and completing tasks based on the fact that the child continued to be maintained in regular education classes. A less than marked limitation was assessed in the interacting and relating with others domain as it had previously been reported to Dr. Gay that the child had not had any significant behavior problems recently. In the 3 remaining domains (moving about and manipulating objects, caring for oneself, and health and physical well-being), T.S.T. was found to have no limitations. Among the records that were examined by Dr. McFarlain were those from Dr. Gay, the Function Reports completed by Ms. Taylor and Ms. Glynn, and those generated by Dr. Steck on August 1, 2007. In conclusion, Dr. McFarlain found the allegations of mental limitations only

partially credible. (Tr. pp. 115-121).

On September 11, 2007, plaintiff's teacher at the Sylvanie Williams School completed the Administration's "Teacher Questionnaire" form.  She had known T.S.T. for about 6 months during which she had instructed the child in English, math, social studies, and science.  T.S.T.'s actual grade level was not identified but her reading, math, and written language skills were below level.  Having indicated that T.S.T. had problems in the domain of acquiring and using information, the teacher was asked to rate the severity of the child's problems in 10 enumerated activities using a 5-point scale that ranged from "no problem" ("1") to "a very serious problem" ("5").  There, the teacher indicated that T.S.T. had an obvious problem ("3") in 3 of the listed activities, a slight problem in 5 of the activities, and no problem in the remaining 2 activities.  There were no problems noted by the teacher in the domain of attending and completing tasks.  In the domain of interacting and relating with others, the child was thought to have a slight problem in 5 of the 13 enumerated activities but no problem in the other 8.  It had not been necessary to implement any behavior modification strategies and the child's speech was understandable almost all of the time.

T.S.T.'s teacher perceived that the child had no problems in the domains of moving about and manipulating objects or in caring

17

for herself.   In the final domain of health and physical well-being, the teacher essentially deferred, having no knowledge of whether T.S.T. was on medication and, if so, whether it was taken on a regular basis.   The child did not frequently miss school due to illness. (Tr. pp. 77-84).   The record also contains an undated, unsigned "Questionnaire For Children Claiming SSI Benefits" form which was only partially completed. The answers that were given on the form indicated that the school had made special accommodations for T.S.T. and that she received special counseling/tutoring inside and outside of school by a Ms. Bolds.   When asked whether the child had ever been tested or evaluated by any departments, agencies, or the like, the answers that were given were all in the negative. The remaining questions on the form were unanswered. (Tr. pp. 85-92).

On December 28, 2007, T.S.T. and her mother were seen by Michael Santone, a Family Psychiatric/Mental Health Nurse Practitioner who was affiliated with Dr. Dahmes.   Ms. Taylor reported that the child cried daily and T.S.T. was sad and felt like her peers picked on her.   Ms. Taylor further reported that T.S.T. experienced tantrums which included banging her head on the wall.   Mr. Santone observed the child to be quiet with poor eye contact and a flat affect and Ms. Taylor described her as distant, being isolated, and withdrawn.   T.S.T. was started on Zoloft, 25

milligrams in the morning, with the mother to monitor for any increased sadness, suicidal ideations, or other possible side-effects. (Tr. p. 144).

Also included in the administrative record is a standardized form that was completed on December 30, 2007 denominated "OMH/MHR Individualized Services/Recovery Plan-Youth." The desired outcome expressed by Ms. Taylor was for T.S.T. to stop being so sad with the child herself experiencing a desire to be happy. The "prioritized therapeutic needs" of T.S.T. were identified as a need to control her anger, to get along with others, to show respect, to improve her self-esteem, and to attend doctor's appointments. Anger identification and management skills were discussed and timetables were established within which T.S.T. was to have accomplished certain objectives. Problem-solving techniques were also discussed to improve the child's social skills. Communication methods were touched upon to enhance respect, a plan was implemented to help with self-esteem, and the staff agreed to work with Ms. Taylor and her daughter in the scheduling and attending of doctor's appointments. When asked what constituted a "crisis" for the child, Ms. Taylor identified the occasions when T.S.T. was fighting with her siblings, being bossy, crying a lot, and isolating herself from everyone with precipitating events being the child's siblings picking on her and her inability to understand her

school work.   Ms. Taylor was instructed on the courses of action she should take to address these concerns.  Ms. Taylor was referred to a psychiatrist, a long term counseling program, an entity that could provide services in the event of a crisis, and to the Central City Mental Health Clinic.   At the conclusion of the session, T.S.T. expressed a desire to lay down and go to sleep. (Tr. pp. 122-132).

On February 22, 2008, T.S.T. and her mother returned to Nurse Practitioner Santone. Ms. Taylor reported that the child continued to cry and that she had been called to the school due to the child being a "baby." Ms. Taylor admitted that she had stopped giving the child her prescribed medication and had instead been giving T.S.T. her other daughter's ADHD medication. There were no reports of the child banging her head although she still had verbal tantrums. The plan was to maintain T.S.T. on her present dosage of Zoloft and Ms. Taylor was cautioned against mixing her children's medications. (Tr. p. 142). By April 8, 2008, Ms. Taylor indicated that her child was still crying constantly and continued to be bossy with peers, angry, and to scream. Compliance was raised as a possible issue with Ms. Taylor expressing resistance to a suggested increase in the dosage of Zoloft. No evidence of self-destructive behavior was noted.  The plan was to keep T.S.T. on her present level of medication as the suggested increase had been refused by

Ms. Taylor. (Tr. p. 140).

On April 15, 2008, Ms. Taylor provided information to the Social Security Administration that was incorporated into a "Disability Report-Child" form. According to that report, the only doctor and the only occasion T.S.T. had been seen for her condition was by Dr. Steck on August 1, 2007 with no future appointments being scheduled. The child was then in the second grade and the schools she had attended were identified as Sherwood Elementary School in Houston from October of 2005 to May of 2006, Buchanan Elementary School in Baton Rouge from August of 2006 to April of 2007, and Sylvanie Williams School in New Orleans from April to June of 2007. At none of those schools had T.S.T. been tested for behavioral or learning problems but reference was made to the OMH/MHR evaluation in 2007. (Tr. pp. 60-66).

When T.S.T. returned to Nurse Practitioner Santone on June 4, 2008, it was reported that she continued to yell, scream, and cry. She had recently stabbed her sister with a pen. The child had a flat affect and still experienced depression and irritability. T.S.T. had been compliant with her medication and was reported to be more sleepy in the evenings. The dosage of Zoloft was doubled with no opposition from Ms. Taylor being noted. (Tr. p. 138). The dosage increase was apparently effective because by July 2, 2008, T.S.T. was not crying, yelling, or screaming anymore. To avoid

stomach upset, Ms. Taylor was to make sure that the child ate before taking her medication. T.S.T.'s affect was brighter, she was well-dressed, was passing on to the next grade, and had a steady diet and sleeping patterns.  The child was continued on her then present medications. (Tr. p. 136).

The final medical note appearing in the record documents T.S.T.'s return visit to Nurse Practitioner Santone on July 30, 2008. Despite some stomach upsetment, the child was compliant with her medications, was eating and sleeping well, and was no longer fighting.  Ms. Taylor felt that T.S.T.'s depression was lifting as she appeared more outgoing although she tended to still be very sensitive.  The medication regimen was continued. (Tr. p. 134). The hearing before the ALJ would subsequently go forward on August 26, 2008. (Tr. pp. 148-172).

As noted earlier, plaintiff's cross-motion for summary judgment presents no specific challenge(s) to the Commissioner's decision.  What plaintiff does argue is that she suffers from various conditions and resulting symptoms which, when considered together, impose severe limitations.  The Court harbors grave doubts as to whether plaintiff's motion is sufficiently supported as Rule 56 requires. See, e.g., Spellman v. Shalala, 1 F.3d 357, 360 (5th Cir. 1993).  Suffice it to say that the mere fact that a child suffers from severe impairments, standing alone, is

insufficient to warrant an award of Social Security benefits as that only satisfies the second step of the 3-step sequential analysis of §416.824.  As plaintiff makes no cogent argument that T.S.T.'s condition satisfies the criteria of or is medically equal to a specific condition set forth in the Listing of Impairments, the Court will evaluate the Commissioner's decision under the functional equivalence standard as that is the analysis that the ALJ undertook.

Functional equivalence is determined by assessing the degree of a child's limitations in 6 domains with listing-level severity being established if the child has "marked" limitations in 2 of the 6 domains or if she has an "extreme" limitation in 1 domain.  20 C.F.R. §416.926a(a).  A marked limitation exists when an impairment or combination of impairments interferes seriously with the child's ability to independently initiate, sustain, or complete activities. 20 C.F.R. §416.926a(e)(2)(i).  A child's day-to-day functioning may be seriously limited when her impairments limit only 1 activity or when the interactive cumulative effects of her impairments limit several activities. Id. A marked limitation is one that is more than moderate but less than extreme. Id. No one piece of information can be viewed in isolation in determining whether a particular limitation is marked. 20 C.F.R. §416.926a(e)(4).

An extreme limitation exists when an impairment or combination

of impairments interferes very seriously with the child's ability to independently initiate, sustain, or complete activities. 20 C.F.R. §416.926a(e)(3)(i). A child's day-to-day functioning may be very seriously limited when her impairments limit only 1 activity or when the interactive and cumulative effect of her impairments limit several activities. Id. An extreme limitation is one that is more than marked and is the rating that is given to the worst limitations. Id.

The ALJ in the present case found that T.S.T. suffered from less than a marked limitation in the first 3 domains identified in §416.926a(b)(1) and had no limitations in the other 3 domains. Although plaintiff presents no specific argument that the ALJ erred in that regard, several of the domains can quickly be disposed of and excluded from a more extensive analysis. In the domain of moving about and manipulating objects, the Administration must consider how well the child is able to move her body from one place to another and how the child moves and manipulates things, otherwise known as gross and fine motor skills. 20 C.F.R. §416.926a(j). A school-age child such as T.S.T. should have developing gross motor skills that would allow her to move at an efficient pace about her school, home, and neighborhood, expand the child's ability to enjoy a variety of physical activities, and do things like use many kitchen and household tools independently, use

scissors, and write.  20 C.F.R. §416.926a(j)(2)(iv).  Examples of limited functioning in moving about and manipulating objects as set forth in the Regulations are as follows:

> (i)      You experience muscle weakness, joint stiffness, or sensory loss (e.g. spasticity, hypotonia, neuropathy, or paresthesia) that interferes with your motor activities (e.g., you unintentionally drop things).
> (ii)     You have trouble climbing up an down stairs, or have jerky or disorganized locomotion or difficulty with your balance.
> (iii)    You have difficulty coordinating gross motor movements (e.g., bending, kneeling, crawling, running, jumping rope, or riding a bike).
> (iv)     You have difficulty with sequencing hand or finger movements.
> (v)      You have difficulty with fine motor movement (e.g., gripping or grasping objects).
> (vi)     You have poor eye-hand coordination when using a pencil or scissors.

> 20 C.F.R. §416.926a(j)(3)

Like the ALJ, T.S.T.'s teacher had previously found that the child had no limitations in this domain.  Dr. Gay also noted no limitations that would fall within this domain and in the Function Report that was completed on February 26, 2007, Ms. Taylor reported that T.S.T. was not limited physically which she later reconfirmed at the administrative hearing.  Despite certain limitations that were set forth by Ms. Taylor in the Function Report, those were not physical limitations <u>per se</u> but were activities that a child 8 years of age would understandably sometimes have to be reminded to do.  In the Function Report that was subsequently completed by

25

T.S.T.'s aunt, she contradicted Ms. Taylor on some of the child's physical abilities but again the issue was more about motivation as opposed to physical capabilities.  Dr. McFarlain similarly found that T.S.T. had no limitations in the domain of moving about and manipulating objects.  The ALJ's determination with respect to this domain was supported by substantial evidence.

In the domain of caring for oneself, the Commissioner is to consider how well the child maintains a healthy emotional and physical state including how well she gets her wants and needs met in an appropriate way, how the child copes with stress and changes in the environment, and whether the child takes care of her own health, possessions, and living area. 20 C.F.R. §416.926a(k).  A school-age child like T.S.T. "... should be independent in most day-to-day activities (e.g., dressing yourself, bathing yourself), although you may still need to be reminded sometimes to do this routinely", be able to recognize her strengths and weaknesses, begin to develop an understanding of what is right and wrong, and begin to demonstrate control over her behavior.  20 C.F.R. §416.926a(k)(2)(iv).  The Regulations set forth the following examples of limited functioning in caring for oneself:

> (i)      You continue to place non-nutritive or inedible objects in your mouth.
> (ii)     You often use self-soothing activities showing developmental regression (e.g., thumb-sucking, re-chewing food), or you have restrictive or stereotyped mannerisms

26

(e.g., body rocking, headbanging).
(iii)        You do not dress or bathe yourself appropriately for
your age because you have an impairment(s) that affects this
domain.
(iv)        You engage in self-injurious behavior (e.g.,
suicidal thoughts or actions, self-inflicted injury, or
refusal to take your medication), or you ignore safety rules.
(v)        You do not spontaneously pursue enjoyable activities
or interests.
(vi)        You have disturbance in eating or sleeping patterns.

20 C.F.R. §416.926a(k)(3)

T.S.T.'s teacher, like the ALJ, found that the child had no

limitations in this domain.  The Regulation recognizes that,

depending on the age of child, she may need to be reminded to do

things like take a bath and, in any event, Ms. Glynn reported that

the child could shower or bathe without help.  It was also reported

to Dr. Gay that T.S.T. could tie her shoelaces, button a button,

and wash, bathe, and groom herself.  The child's eating and

sleeping patterns have been steady throughout and although there

was reference to her banging her head on the wall on a sole

occasion, that was prior to her being placed on the right dosage of

medication.  The ALJ was correct in concluding that the child did

not have a marked impairment in this domain.

In the domain of health and physical well-being, consideration

is given to the cumulative physical effects of a child's physical

or mental impairments and associated treatment on the child's

functioning that were not considered in connection with the moving

27

about and manipulating objects domains.   20 C.F.R. §416.926a(1).
Examples of limitations in health and physical well-being include
the following:

> (i)      You have generalized symptoms, such as weakness,
> dizziness, agitation (e.g., excitability), lethargy (e.g.,
> fatigue or loss of energy or stamina), or psychomotor
> retardation because of your impairment(s).
> (ii)     You have somatic complaints related to your
> impairments (e.g., seizure or convulsive activity, headaches,
> incontinence, recurrent infections, allergies, changes in
> weight or eating habits, stomach discomfort, nausea, headaches
> or insomnia).
> (iii)    You have limitations in your physical functioning
> because of your treatment (e.g., chemotherapy, multiple
> surgeries, chelation, pulmonary cleansing, or nebulizer
> treatments).
> (iv)     You have exacerbations from one impairment or a
> combination of impairments that interfere with your physical
> functioning.
> (v)      You are medically fragile and need intensive medical
> care to maintain your level of health and physical well-being.

20 C.F.R. §416.926a(1)(4)

In this domain, the ALJ found, as had Dr. McFarlain and
T.S.T.'s teacher, that the child had no limitations in health and
physical well-being. T.S.T. was a healthy child who had no prior
hospitalizations or significant medical problems of any type.  Once
she was placed on the proper medication regimen, non-academic
behavioral concerns appear to have been eliminated almost entirely
and Ms. Taylor admitted as much at the administrative hearing.  No
marked impairment in the domain of health and physical well-being
is apparent.

28

The Court now turns to the 3 domains that the ALJ found that T.S.T. had limitations in, albeit limitations that were less than marked.  In the domain of attending and completing tasks, the Commissioner considers how well a child is able to focus and maintain attention and how well the child begins, carries through, and finishes activities, including the pace at which they are performed and the ease with which they can be changed.  20 C.F.R. §416.926a(h).  A school-age child like T.S.T. should be able to focus her attention in a variety of situations in order to follow directions, remember and organize school materials, and complete classroom and homework assignments. 20 C.F.R. §416.926a(h)(2)(iv).  The Regulations contain the following examples of limited functioning in attending and completing tasks.

> (i)      You are easily startled, distracted, or overreactive to sounds, sights, movements, or touch.
> (ii)     You are slow to focus on, or fail to complete activities of interest to you, e.g., games or art projects.
> (iii)    You repeatedly become side-tracked from your activities or you frequently interrupt others.
> (iv)     You are easily frustrated and give up on tasks, including ones you are capable of completing.
> (v)      You require extra supervision to keep you engaged in an activity.

20 C.F.R. §416.926a(h)(3)

In finding that T.S.T. had a less than marked impairment in attending to and completing the tasks, the ALJ acknowledged Ms.

Taylor's testimony regarding difficulty in completing homework assignments and poor concentration, persistence, and pace.  Those reports notwithstanding, T.S.T.'s teacher believed that the child had no problems in this domain whatsoever.  Presumably the teacher was in the best position to determine whether the child was successfully completing her homework assignments; indeed, that was one of the activities the teacher would have had to rate T.S.T. on if the teacher observed any problems in this domain. (Tr. p. 79). Although the child had been held back in the second grade, she had successfully passed to the third grade where she was in regular education classes.

When evaluated by Dr. Gay, T.S.T. was initially slow in approaching the testing materials but she was willing to put forth effort and was able to understand directions without them  having to be explained or repeated.  There is no indication that the required testing could not be completed.  In the Function Report that was prepared on her behalf, Ms. Taylor indicated that T.S.T.'s ability to pay attention and to stick with a task were limited but only to the extent that she could not keep busy on her own.  The mother answered affirmatively to questions asking whether the child finished things she started, worked on arts and crafts projects, completed homework, and completed chores most of the time.  By the time of the administrative hearing, T.S.T. was finally on an

30

effective and appropriate treatment regimen which her mother acknowledged made her much more compliant.  An impairment that can reasonably be controlled with treatment or medication is not disabling.  Johnson, 864 F.2d at 348.  Plaintiff makes no specific argument to the contrary and considering the record as a whole, the ALJ properly found that T.S.T. had less than a marked impairment in the domain of attending and completing tasks.

In the domain of interacting and relating with others, consideration is given to how well a child initiates and sustains emotional connections with others, develops and uses the language of the community, cooperates with others, complies with rules, responds to criticism, and respects the possessions of others. 20 C.F.R. §416.926a(i).  In this domain, a school-age child should be able to develop more lasting relationship with other children of the same age, begin to understand how to work in groups, have an increasing ability to understand another's point of view, and be able to talk with people in an understandable fashion. 20 C.F.R. §416.926a(i)(2)(iv).  Examples of limited functioning in interacting and relating with others are as follows:

(i)      You do not reach out to be picked up and held by your caregiver.
(ii)     You have no close friends, or your friends are all older or younger than you.
(iii)    You avoid or withdraw from people you know or you are overly anxious or fearful of meeting new people or trying

new experiences.
(iv)      You have difficulty playing games or sports with rules.
(v)       You have difficulty communicating with others; e.g., in using verbal and nonverbal skills to express yourself, carrying on a conversation, or in asking others for assistance.
(vi)      You have difficulty speaking intelligibly or with adequate fluency.

20 C.F.R. §416.926a(i)(3).

The ALJ acknowledged that T.S.T. had some problems in using adequate vocabulary and grammar to express thoughts and ideas in general everyday conversation and that she tended to stay in the house if other children were outside playing.  When she was evaluated by Dr. Gay, plaintiff initially presented as somewhat guarded but quickly became more responsive and interactive and was able to answer the questions asked of her adequately.  She had not experienced any significant behavior problems at school recently.  There was a 20% deficit in understandable speech but T.S.T. was reportedly compliant and generally well-behaved at school even though she was on no medication at the time.  At home, the child was more withdrawn and tended to spend more time alone.  However, in Ms. Taylor's Function Report, she indicated that T.S.T. had friends her own age, could make new friends, and generally got along with adults and teachers although she participated in no team sports.  Her ability to accept criticism was questioned.  When seen

by Dr. Steck on August 1, 2007, T.S.T. was described as a "charming 8 year-old" with a helpful and hopeful attitude, adequate speech skills, and a good rapport.  For her part, in this domain, T.S.T.'s teacher indicated that the child had some functional problems but of the 13 enumerated activities that were rated, the teacher believed that the child only had a slight problem in 5 of the activities with no problems being perceived in the other 8 activities.  Keeping in mind the teacher's unique observational perspective, she felt that T.S.T. had no problems in playing cooperatively with other children, making and keeping friends, seeking attention, expressing anger, asking permission appropriately, and respecting/obeying adults in authority.  It had not been necessary to implement any behavior modification strategies.  After the child went under the care of Nurse Practitioner Santone and an effective medication regimen was put into place, plaintiff's compliance and demeanor improved greatly. Recalling that a marked limitation is defined as one that is more than moderate but less than extreme, in light of the evidence that was before him the Court is unable to say that the ALJ erred here.

The final domain that was addressed by the ALJ was that of acquiring and using information where consideration is given to how well a child acquires and learns information and how well she uses the information that she has learned.  20 C.F.R. §416.967a(g).  For

33

a school-age child like T.S.T., the child should be able to learn to read, write, and do math and discuss history and science.  20 C.F.R. §416.967a(2)(iv).  The Regulations set forth the following as examples of limited functioning in acquiring and using information:

>    (i)      You do not demonstrate understanding of words about space, size, or time; e.g., in/under, big/little, morning/night.
>    (ii)     You cannot rhyme words or the sounds in words.
>    (iii)    You have difficulty recalling important things you learned in school yesterday.
>    (iv)     You have difficulty solving mathematics questions or computing arithmetic answers.
>    (v)      You talk only in short, simple sentences and have difficulty explaining what you mean.

>                                    20 C.F.R. §416.926a(g)(3).

In addressing this domain, the ALJ found that T.S.T. had less than a marked limitation although the child's teacher had indicated that she did not like to follow directions or instructions.  It was in this domain that the teacher expressed the greatest concern over T.S.T.'s performance.  She assessed the child as having obvious problems in reading and comprehending written materials, in providing organized oral explanations and adequate descriptions, and in expressing ideas in written form.  However, while obvious, the problems were not considered to be serious or very serious.  T.S.T.'s teacher further felt that the child had a slight problem

34

in understanding school and content vocabulary, in comprehending and doing math problems, in understanding and participating in class discussions, in recalling and in applying learned material, and in applying problem-solving skills in class discussions.  The child had no problems in comprehending oral instructions or in learning new material.  When tested by Dr. Gay, T.S.T. achieved a full-scale IQ score that was in the borderline range of intelligence and she was felt to be performing below average cognitively.  However, the child's general fund of knowledge was adequate.  In the Function Report that was completed on her behalf, Ms. Taylor expressed serious concerns over the level of T.S.T.'s academic performance.  Dr. Steck would subsequently assess the child as having average intellectual functioning with good insight/judgment and rapport.  Like Ms. Taylor, T.S.T.'s aunt expressed similar concerns over the child's academic performance. The full scale IQ score was cited by Dr. McFarlain in finding that the child did not have a marked impairment in this domain.  Now that the child is on a proper medication regimen that makes her more compliant, it remains to be seen what effect that will have on her academic performance.

Here, again, plaintiff offers no specific challenge to the ALJ's finding with respect to this domain.  Although she was held back in the second grade, T.S.T. was promoted to the third grade

and was in regular education classes.  The child's teacher did not think she had a serious or very serious problem in the 10 enumerated activities but did have an "obvious" problem in 3, a slight problem in 5 others, and no problem in the remaining 2. The Court does not believe that a marked limitation in the domain of acquiring and using information has been established here, one that is more than moderate but less than extreme.  At any rate, because the Court believes that the ALJ properly found that T.S.T. did not have a marked limitation in the other 5 domains discussed above, to establish medical equivalence here she would have to demonstrate that her limitation in acquiring and using information is "extreme". That substantial showing has not been made.

## RECOMMENDATION

For the foregoing reasons, it is recommended plaintiff's motion for summary judgment be denied and that defendant's motion for summary judgment be granted.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation contained in a magistrate judge's report and recommendation within 14 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  Douglass v.

<u>United Services Auto. Assoc.</u>, 79 F.3d 1415 (5th Cir. 1996)(<u>en</u> <u>banc</u>).

     New Orleans, Louisiana, this <u>28th</u> day of <u>February</u>, 2011.

                                    ALMA L. CHASEZ
                    UNITED STATES MAGISTRATE JUDGE